UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------X
CHRISTOPHER MILTON, and WENDY GUZMAN,
individually and as parents and legal
guardians of Plaintiff, Z.G.M.,

                        Plaintiffs,

        -against-                              MEMORANDUM & ORDER
                                               15-CV-0127(JS)(AKT)
VALLEY STREAM CENTRAL HIGH SCHOOL
DISTRICT, VALLEY STREAM SOUTH HIGH
SCHOOL, MAUREEN HENRY, JACQUELINE
ALLEN, MICHAEL MAHLER, BARBARA MADIGAN,
"JOHN DOE" GERAMINA, CAROLINE BORMANN,
J.C., a minor, "JOHN DOE" CANNON and
"JANE DOE" CANNON, individually and as
parents and legal guardians of minor
J.C., and JANE and JOHN DOES 1-10,

                        Defendants.
--------------------------------------X
APPEARANCES
For Plaintiffs:           Frederick K. Brewington, Esq.
                          Cathryn Annette Harris, Esq.
                          Tricia Sophia Lindsay, Esq.
                          Law Offices of Frederick K. Brewington
                          556 Peninsula Boulevard
                          Hempstead, NY 11550


For Defendants:
Valley Stream Central
High School District,
Valley Stream South
High School, Maureen
Henry, Kara Jacobson,
Jacqueline Allen, Michael
Mahler, Ellen Daniels,
Barbara Madigan, "John
Doe" Drumm, "John Doe"
Geramina, Nurse Jane Doe
and Caroline Bormann       Gerald Stephen Smith, Esq.
                           Silverman and Associates
                           445 Hamilton Avenue, Suite 1102
                           White Plains, NY 10601

For J.C., a minor,
"John Doe" Cannon and
"Jane Doe" Cannon          Matin Emouna, Esq.
                          Law Offices of Matin Emouna
                          110 Old Country Road, Suite 3
                          Mineola, NY 11501

SEYBERT, District Judge:

Christopher Milton and Wendy Guzman, individually and as parents and legal guardians of minor Z.G.M. ("Plaintiffs") commenced this action against Valley Stream Central High School District, Valley Stream South High School, Maureen Henry, Kara Jacobson, Jacqueline Allen, Michael Mahler, Ellen Daniels, Barbara Madigan, "John Doe" Drumm, "John Doe" Geramina, Nurse Jane Doe, Caroline Bormann, J.C., a minor, and "John Doe" Cannon and "Jane Doe" Cannon, as parents and legal guardians of minor J.C., on January 9, 2015. (Compl., Docket Entry 1.) Z.G.M. was assaulted by J.C. while they were both students at Valley Stream South High School. On January 26, 2017, Plaintiffs voluntarily dismissed the claims against Kara Jacobson, Ellen Daniels, "John Doe" Drumm, and Nurse Jane Doe. (See Stip., Docket Entry 64; Electronic Order, January 30, 2017.) The remaining defendants affiliated with the school district--Valley Stream Central High School District (the "District"), Valley Stream South High School (the "School"), Maureen Henry, Jacqueline Allen, Michael Mahler, Barbara Madigan, "John Doe" Geramina, and Caroline Bormann (collectively the "District Defendants")--have moved for summary judgment. (Dist.

Defs.' Mot., Docket Entry 66.) For the reasons that follow, the District Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART.

BACKGROUND

I.   Factual Background[1]

   A.   The Assault

      On January 16, 2014, Z.G.M., a student at Valley Stream South High School, left class to retrieve a book from his locker. (Z.G.M. 50-H Exam., Smith Decl. Ex. M, Docket Entry 67-15, 9:5-19, 12:14-21.) Z.G.M. testified that before he reached his locker, he saw J.C. in the hallway, who called him "Afro Man" and "Afro Jack" and began walking toward him. (Z.G.M. 50-H Exam. 13:12-16:21.) Z.G.M. testified that after retrieving the book, he began walking toward a stairwell to return to his class, and J.C. followed him while continuing to call him names. (Z.G.M. 50-H Exam. 17:9-18:3.) According to Z.G.M., before he reached the stairwell, J.C., who was "getting loud[,] . . . started pushing up against [his] left shoulder," and Z.G.M. called J.C. "Chewbacca."

---

[1] The following material facts are drawn from the District Defendants' Local Civil Rule 56.1 Statement (Defs.' 56.1 Stmt., Docket Entry 59), Plaintiffs' Local Civil Rule 56.1 Response (Pls.' 56.1 Resp., Docket Entry 60, at 1-37), Plaintiffs' Local Civil Rule 56.1 Counterstatement (Pls.' 56.1 Counterstmt., Docket Entry 60, at 38-74), and the exhibits referred to therein. Any relevant factual disputes are noted. All internal quotation marks and citations have been omitted.

(Z.G.M. 50-H Exam. 19:6-22.) Afterward, Z.G.M. continued walking toward the stairwell. (Z.G.M. 50-H Exam. 23:21-24:7.) The next things he remembers is waking up in a wheelchair in the nurse's office. (Pls.' 56.1 Counterstmt. ¶ 294; Z.G.M. 50-H Exam. 23:21-25:22.)

"John Doe" Drumm ("Drumm") was a teaching assistant at the School. (Defs.' 56.1 Stmt. ¶ 26.) Drumm testified that at approximately 1:45 p.m., he observed Z.G.M. and J.C. standing "face to face," heard someone say "fuck," and saw J.C. punch Z.G.M. in the head. (Defs.' 56.1 Stmt. ¶¶ 29, 32.) Z.G.M. fell backwards, and Drumm testified that he ran over to see if he was okay. (Defs.' 56.1 Stmt. ¶¶ 33-34.) Drumm testified that when he laid Z.G.M. down on his back, he saw his "eyes rolling back" and yelled to several teachers to contact the nurse or call an ambulance. (Defs.' 56.1 Stmt. ¶ 35; Pls.' 56.1 Resp. ¶ 35.) Drumm testified that the nurse, Caroline Bormann ("Nurse Bormann") arrived within two minutes and that he relayed what he saw, including that Z.G.M.'s eyes rolled back after the blow. (Defs.' 56.1 Stmt. ¶¶ 36, 38; Pls.' 56.1 Resp. ¶ 38.) However, Nurse Bormann later testified that Drumm did not mention Z.G.M's eyes rolling back. (Bormann Dep., Smith Decl. Ex. P, Docket Entry 67-18, 12:8-11.) Drumm subsequently completed an incident report and a police report

describing the events he witnessed.  (Defs.' 56.1 Stmt. ¶¶ 107-08.)

Nurse Bormann testified that she was in her office when her secretary received a phone call about the incident and told her that a student had passed out.  (Pls.' 56.1 Counterstmt. ¶ 56; Bormann Dep. 7:25-8:14.)  She testified that when she arrived, she saw Z.G.M. lying on the floor in the hallway.  (Defs.' 56.1 Stmt. ¶ 45.)  The parties dispute whether Z.G.M. was alert and oriented when Nurse Bormann arrived; she testified that Z.G.M. was alert and oriented, (Bormann Dep. 12:3-7, 45:23-25), but a concussion checklist indicates confusion and memory loss (Concussion Checklist, Smith Decl. Ex. Q, Docket Entry 67-19), and the principal, Maureen Henry ("Principal Henry"), testified that Z.G.M. was not "fully alert," (Henry Dep., Smith Decl. Ex. B, Docket Entry 67-3, 12:8-9).  The parties also dispute the extent to which Z.G.M. was able to answer questions.  For example, the District Defendants allege that Z.G.M. was able to answer several questions asked by Nurse Bormann, while Plaintiffs maintain that Z.G.M. was "actually unconscious" when Nurse Bormann arrived and "was only able to answer questions with difficulty after he regained consciousness, [because his] memory was not intact." (Defs.' 56.1 Stmt. ¶ 47; Pls.' 56.1 Resp. ¶ 47.)  Nurse Bormann testified that she asked Z.G.M. to "squeeze her fingers and wiggle his feet," and found his eyes to be "round, equal and reactive."

(Defs.' 56.1 Stmt. ¶ 48; Bormann Dep. 14:7-20.)  Plaintiffs deny that Z.G.M.'s eyes were "round, equal and reactive."  (Pls.' 56.1 Resp. ¶ 49.)  Principal Henry testified that when she arrived, she observed that Z.G.M. was conscious and lying on the floor.  (Defs.' 56.1 Stmt. ¶ 53.)

At that point, Z.G.M. was transported to the Nurse's Office in a wheelchair.  (Defs.' 56.1 Stmt. ¶ 56.)  Principal Henry testified that she accompanied Z.G.M. to the Nurse's Office, where she asked questions about the incident and "tr[ied] to make him comfortable."  (Defs.' 56.1 Stmt. ¶¶ 57, 59; Henry Dep. 11:2-23.) However, Z.G.M. testified that Principal Henry was "intimidating [him]" and "tried to make it seem like [he] was the one who provoked . . . the incident."  (Pls.' 56.1 Resp. ¶ 59; Z.G.M. 50-H Exam. 28:7-16.)  Z.G.M. testified that he was able to answer the questions asked by Nurse Bormann and Principal Henry without difficulty.[2]  (Defs.' 56.1 Stmt. ¶ 60; Z.G.M. 50-H Exam. 28:4-6.) While in the office, Nurse Bormann completed the Concussion Checklist and noted complaints of pain "posterior [to the] right eye," that there was a loss of consciousness "reported by teacher," and that Z.G.M. did not remember the injury "at the time of the incident but slowly is coming back."  (Defs.' 56.1 Stmt. ¶ 61; Concussion Checklist.)  Additionally, she circled "Yes" for

---

[2] Plaintiffs admit this but also maintain that Z.G.M. "had not regained his full memory."  (Pls.' 56.1 Resp. ¶ 60.)

"memory problems," "vacant stare/glassy eyed," "headache," and "feeling 'dazed.'" (Concussion Checklist.) The parties dispute whether Nurse Bormann contacted Z.G.M.'s father, Christopher Milton ("Milton") to inform him of the incident; the District Defendants allege that Nurse Bormann called him, while Plaintiffs allege that Milton was called by Wendy Guzman, Z.G.M.'s mother ("Guzman"), and that he never spoke with Nurse Bormann.[3] (Defs.' 56.1 Stmt. ¶¶ 64-66; Pls.' 56.1 Resp. ¶¶ 64-66.) However, it is undisputed that Nurse Bormann did call Guzman, and that while Z.G.M. waited for his mother to arrive, he complained of pain behind his right eye. (Defs.' 56.1 Stmt. ¶¶ 67-68.) Nurse Bormann testified that she told him to immediately alert her if he had changes in his vision. (Defs.' 56.1 Stmt. ¶ 69.)

The Concussion Checklist indicated that Z.G.M.'s parents were advised to seek medical attention. (Defs.' 56.1 Stmt. ¶ 63.) There is some dispute regarding what Nurse Bormann advised Z.G.M.'s parents to do; Nurse Bormann testified that she told Guzman she needed to take Z.G.M. to a doctor "immediately." (Bormann Dep. 29:24-25.) Guzman testified that Nurse Bormann told her to take the Concussion Checklist to Z.G.M.'s doctor and "see what they

---

[3] Oddly, Plaintiffs' 56.1 Response and 56.1 Counterstatement of Facts contradict each other. Plaintiffs deny that Nurse Bormann called Milton in their Response, (see Pls.' 56.1 Resp. ¶¶ 64-66), but allege that Nurse Bormann called Milton in their Counterstatement, (see Pls.' 56.1 Counterstmt. ¶ 65).

say" but that Nurse Bormann did not tell her to go immediately. (Pls.' 56.1 Resp. ¶ 63; Guzman 50-H Exam., Smith Decl. Ex. N, Docket Entry 67-16, 16:25-17:13.) At that point, Guzman testified that she demanded that Nurse Bormann call an ambulance because she was concerned about internal bleeding, and an ambulance was called. (Pls.' 56.1 Resp. ¶¶ 63, 74; Guzman 50-H Exam. 17:14-21.) Nurse Bormann acknowledged that she called an ambulance at Guzman's request, but also testified that she called after Z.G.M. complained of "seeing waves."[4] (Defs.' 56.1 Stmt. ¶¶ 74, 76.) The police arrived first, and the ambulance arrived about twenty minutes later. (Pls.' 56.1 Counterstmt. ¶ 75; Bormann Dep. 31:11-32:22.)

Principal Henry testified that at some point before the police and ambulance arrived, Guzman confronted her and asked why she had not called the police. (Pls.' 56.1 Counterstmt. ¶ 137; Henry Dep. 31:4-8.) Principal Henry explained that she did not call the police "because [she] felt there was no need for the police, because [Z.G.M.] didn't have any marks on his body, and

---

[4] The District Defendants' expert, Dr. S. Murthy Vishnubhakat, reviewed Z.G.M.'s medical records, Nurse Bormann's deposition, and the school records and concluded that "the care rendered by Dr. Bormann and the school authorities was exemplary" and that "Nurse Bormann's actions had nothing to do with the interval increase of the hematoma." (Defs.' 56.1 Stmt. ¶¶ 78-79; Vishnubhakat Rep., Smith Decl. Ex. S, Docket Entry 67-21, at 2-3.) Plaintiffs dispute his conclusions and maintain that his opinion is based on misconceptions and contradicts the findings in the Concussion Checklist. (Pls.' 56.1 Resp. ¶ 78.)

[she] had the boy in the dean's office who did the punch and that [they] were trying to get to the story," but advised Guzman that she "had every right if she wanted to call the police." (Defs.' 56.1 Stmt. ¶ 102; Henry Dep. 31:10-17.) Plaintiffs dispute that Principal Henry advised Guzman that she could call the police. (Pls.' 56.1 Resp. ¶ 102.) Milton testified that when he arrived at the School, he was told that Principal Henry was too busy to speak to him, but that he insisted on talking to her. (Pls.' 56.1 Counterstmt. ¶ 266; Milton 50-H Exam., Smith Decl. Ex. O, Docket Entry 67-17, 14:14-20.) He also testified that, when he and Principal Henry spoke, Principal Henry told him: "[w]ell, there is no sense in us talking, because your wife called the police. Your wife called the police. We don't handle business like this." (Pls. 56.1 Counterstmt. ¶ 267; Milton 50-H Exam. 15:5-9.) However, Guzman indicated that she never asked that the police be contacted. (Guzman 50-H Exam. 18:20-23.)

After Z.G.M. was taken to a hospital, he was diagnosed with an epidural hemorrhage which required emergency surgery. (Pls.' 56.1 Counterstmt. ¶ 278.) Since then, he has sought counseling from a therapist regarding the incident but has not

sustained any further complications or ongoing symptoms. (Defs.'
56.1 Stmt. ¶ 130; Pls.' 56.1 Resp. ¶ 130.)

B. <u>The Investigation</u>

The assault occurred in the stairwell between the second
and third floors. (Z.G.M. 50-H Exam. 24:4-25:15.) In January
2014, there were four security guards working at the School,
including one security guard who monitored the second and third
floors. (Pls.' 56.1 Counterstmt. ¶ 106; Allen Dep., Smith Decl.
Ex. D, Docket Entry 67-5, 8:25-9:18.) Teachers were also assigned
to monitor hallways, although no teacher was assigned to monitor
the third floor at the time of the incident. (Pls.' 56.1
Counterstmt. ¶¶ 108-09; Allen Dep. 11:19-22.) There were no
surveillance cameras on the second or third floor. (Pls.' 56.1
Counterstmt. ¶ 107; Allen Dep. 10:21-24.)

According to School policy, a bullying incident is
investigated by the principal, who will determine if the bullying
allegation is credible. (Defs.' 56.1 Stmt. ¶¶ 12-13.) At
Principal Henry's request, Michael Mahler ("Mahler"), the Dean of
Students, brought J.C. to his office and requested a statement
from J.C., which he provided. (Defs.' 56.1 Stmt. ¶¶ 80, 82-85;
J.C. Stmt., Smith Decl. Ex. T, Docket Entry 67-22.) Mahler also
contacted J.C.'s parents and obtained statements from two other
students, E.M. and W.K. (Defs.' 56.1 Stmt. ¶¶ 86-88.) Mahler was
not asked to obtain a statement from Z.G.M. (Defs.' 56.1 Stmt.

¶ 90.)  When J.C. was in Mahler's office, Principal Henry arrived and asked J.C. what happened.  (Defs.' 56.1 Stmt. ¶¶ 93-94.)  J.C. told her that "there were words" between him and Z.G.M., that Z.G.M. pushed him and said "come on, let's fight," and then pushed him again, at which point he punched Z.G.M.[5]  (Defs.' 56.1 Stmt. ¶ 94; Henry Dep. 16:6-16.)  As part of the investigation, Principal Henry also spoke to W.K. and E.M., and J.C. and Z.G.M.'s teachers regarding why they were not in class.  (Defs.' 56.1 Stmt. ¶¶ 95-98.)  After speaking with them, she suspended J.C. for five days.  (Defs.' 56.1 Stmt. ¶ 100; Pls.' 56.1 Resp. ¶ 100.)  After the suspension, she continued to speak with witnesses.  (Defs.' 56.1 Stmt. ¶ 105.)  The matter was subsequently referred for a Superintendent's hearing, and J.C. was suspended for approximately one month.  (Defs.' 56.1 Stmt. ¶ 106; Pls.' 56.1 Resp. ¶ 106.)  In a criminal proceeding, J.C. was adjudicated a youthful offender and pleaded guilty to attempted assault.  (Pls.' 56.1 Counterstmt. ¶¶ 254-55.)

At some point, Principal Henry informed Guzman that disciplinary action had been taken against J.C.; however,

---

[5] J.C. later testified that, initially, he had a "light graze" with Z.G.M. because he did not see Z.G.M.  (Pls.' 56.1 Counterstmt. ¶ 226.)  W.K. testified that he did not recall any pushing between Z.G.M. and J.C., but remembered that they were "chest to chest" before J.C. punched Z.G.M.  (Pls.' 56.1 Counterstmt. ¶¶ 193, 195, 199; W.K. Dep., Smith Decl. Ex. E, Docket Entry 67-6, 16:20-17:18, 30:3-9.)

Plaintiffs maintain that this occurred only after Guzman inquired and that Principal Henry did not specify how J.C. had been disciplined.[6] (Defs.' 56.1 Stmt. ¶ 112; Pls.' 56.1 Resp. ¶ 112.) In April 2014, Principal Henry sent Guzman and Milton a letter indicating that she conducted an investigation pursuant to the District's bullying and harassment policies and concluded that "the allegation of bullying and/or harassment by [Z.G.M.] [was] unfounded."[7] (Defs.' 56.1 Stmt. ¶ 121; Pls.' 56.1 Resp. ¶ 121; Apr. 22, 2014 Letter, Smith Decl. Ex. DD, Docket Entry 67-32, at 1.) Plaintiffs allege that, throughout the investigation, Principal Henry did not update them or provide adequate information regarding the findings or progress of the investigation, and at some point, Milton contacted the assistant superintendent for information. (Pls.' 56.1 Counterstmt. ¶ 272; Milton 50-H Exam. 32:14-33:6.) While the District Defendants allege that the assault was reported in its Violent and Disruptive Incident Reporting Summary for the 2013-2014 school year, Plaintiffs contend that the

---

[6] Plaintiffs allege that J.C. was not required to go to counseling after the assault or to speak with guidance counselors upon his return to school. (Pls.' 56.1 Counterstmt. ¶¶ 248-50; Cannon Dep., Pls.' Opp. Br., Ex. DD, Docket Entry 72-2, at 301-95, 52:16-53:11.)

[7] This letter appears to have been sent in response to a letter sent to Principal Henry by Guzman and Milton on February 19, 2014 making a complaint about a bullying incident. The February 19 letter is not in the record, and as a result, it is not clear whether the underlying incident was the assault by J.C. or events that occurred after Z.G.M.'s return to school.

result of the investigation was not reported to the State Department of Education. (Defs.' 56.1 Stmt. ¶ 122; Pls.' 56.1 Counterstmt. ¶ 154.)

Regarding any prior relationship between the two students, Z.G.M. testified later that he did not know J.C. before encountering him that day, but also stated that J.C. called him "Afro-Man" and "Afro-Jack" about a week before the assault. (Z.G.M. 50-H Exam. 20:7-22:23.) He testified that he did not tell anyone at the school or his parents about that incident. (Z.G.M. 50-H Exam. 22:12-18.) Guzman and Milton testified that prior to the assault, they had never heard of J.C., that Z.G.M. had not mentioned having problems with J.C., and that Z.G.M. never indicated that he was taunted or assaulted by other students. (Defs.' 56.1 Stmt. ¶¶ 18-20, 22-24.) Additionally, Barbara Madigan ("Madigan"), Z.G.M.'s guidance counselor, was not aware of any problems between Z.G.M. and J.C. before the date of the assault. (Defs.' 56.1 Stmt. ¶ 175.) Madigan also testified that Z.G.M. never complained to her about being harassed because of his race and that she did not recall Guzman informing her or Principal Henry that Z.G.M. was being bullied.[8] (Defs.' 56.1 Stmt. ¶ 178; Madigan

---

[8] She did recall him discussing an incident during which "someone made a racist comment" which "didn't pertain to him" at some point while she was his guidance counselor, but could not remember if it was before or after the assault. (Madigan Dep., Smith Decl. Ex. H, Docket Entry 67-9, 56:11-19.)

Dep. 55:24-3; Pls.' 56.1 Counterstmt. ¶ 35.) Milton testified that Z.G.M. never told him about any students making racial comments toward him, and Guzman and Milton both testified that they never told Principal Henry or other school personnel that they believed the assault was racially motivated.[9] (Defs.' 56.1 Stmt. ¶¶ 25, 125, 136; Guzman 50-H Exam. 50:8-13; Milton 50-H Exam. 52:20-23.) Guzman testified that prior to the assault, she never notified personnel at the School that she was concerned about Z.G.M.'s safety. (Guzman 50-H Exam. 49:24-50:4.)

C. Z.G.M.'s Return to School

On February 4, 2014, Z.G.M. returned to school, and Principal Henry met with Guzman, allegedly at Guzman's request. (Defs.' 56.1 Stmt. ¶ 113; Pls.' 56.1 Resp. ¶ 113.) It appears Madigan was also present at the meeting. (Defs.' 56.1 Stmt. ¶ 172; Pls.' 56.1 Counterstmt. ¶ 33.) Principal Henry relayed the information gathered from witnesses and J.C. about the assault, including that there was an allegation that Z.G.M. had flirted with J.C.'s girlfriend. (Defs.' 56.1 Stmt. ¶¶ 114-16; Pls.' 56.1 Counterstmt. ¶ 145.) Plaintiffs allege that Principal Henry also said that Z.G.M. should not have left the classroom to retrieve

---

[9] Plaintiffs dispute this but cite only the Notice of Claim and the Complaint in this matter for support. However, allegations in a Notice of Claim or a Complaint are not sufficient to dispute a particular fact at the summary judgment stage.

his book because he did not have a hall pass. (Pls.' 56.1 Counterstmt. ¶¶ 41-42.) Guzman provided Principal Henry with an Order of Protection, which stated that J.C. must stay away from Z.G.M. "wherever he/she may be [and] make no contact with [Z.G.M.] directly or indirectly, even if invited . . . except for incidental contact at South Valley Stream High School including any school functions . . . ." (Order of Protection, Smith Decl. Ex. CC, Docket Entry 67-31.) Guzman also requested an escort for Z.G.M.[10] (Pls.' 56.1 Counterstmt. ¶ 281; Guzman 50-H Exam. 38:24-39:10.) As a result, Principal Henry provided Z.G.M. with a pass allowing him to leave each class three minutes early, and another student helped him get to each class. (Defs.' 56.1 Stmt. ¶ 123; Pls.' 56.1 Resp. ¶ 123; Guzman 50-H Exam. 39:16-23.)

Plaintiffs maintain that within two days of Z.G.M.'s return to school, two of J.C.'s friends threatened Z.G.M. (Pls.' 56.1 Resp. ¶ 119.) Z.G.M.'s teacher, Ellen Daniels ("Daniels"), overheard the incident and wrote a statement. (Defs.' 56.1 Stmt. ¶ 140.) Afterward, Z.G.M. went to see his guidance counselor, Madigan, who showed him photographs to help him identify the students, and reported what she learned to Principal Henry.

---

[10] Guzman testified that she requested that Z.G.M. be escorted to class because she was concerned about Z.G.M.'s safety and because he was having difficulty walking. (Guzman 50-H Exam. 38:24-39:10.)

(Defs.' 56.1 Stmt. ¶ 140; Z.G.M. 50-H Exam. 53:9-55:4; Disciplinary Referral, Smith Decl. Ex. FF, Docket Entry 67-34, at 3.) A Disciplinary Referral completed by Daniels indicates that one of the students said "There that kid [Z.G.M.] I'm going to kick his ass." (Disciplinary Referral at 3.) Both students were suspended by Principal Henry.[11] (Defs.' 56.1 Stmt. ¶ 119; Z.G.M. 50-H Exam. 55:5-13.) Guzman was contacted by the Assistant Principal, Jacquelin Allen ("Assistant Principal Allen"), regarding the incident and how it was being handled by the School. (Defs.' 56.1 Stmt. ¶ 208.)

        "John Doe" Geramina ("Geramina") was Z.G.M.'s science teacher during the 2013-2014 school year. (Defs.' 56.1 Stmt. ¶¶ 193, 195.) During his deposition, Geramina recalled a conversation with Z.G.M. about the pass that allowed him to leave each class three minutes early. (Defs.' 56.1 Stmt. ¶ 199.) He testified that he spoke with Z.G.M. on the first day he used the pass and asked him "what the pass was for" and asked him several weeks later "when the pass expired." (Geramina Dep., Smith Decl. Ex. HH, Docket Entry 67-36, 17:18-18:12.) Plaintiffs allege that Z.G.M. complained to Madigan and Principal Henry about Geramina

---

[11] Plaintiffs point out that the students only received one day of in-school suspension. (Pls.' 56.1 Resp. ¶ 158.)

questioning him about the pass in front of the class. (Guzman 50-H Exam. 48:8-15; Pls.' 56.1 Counterstmt. ¶ 155.)

Madigan testified that when J.C. returned to school after his suspension, Z.G.M. came to talk to her and was "very worried" and "very concerned at what might happen." (Pls.' 56.1 Counterstmt. ¶ 50; Madigan Dep. 51:13-52:4.) However, Z.G.M. never told Guzman of any interaction he had with J.C. after he returned, or that J.C. violated the Order of Protection in the months following the assault. (Defs.' 56.1 Stmt. ¶¶ 126-27, 131; Pls.' 56.1 Resp. ¶ 131.) Additionally, Z.G.M. never told Milton about any incidents with J.C. after the assault or that students made racially motivated comments toward him between the time of the assault and the end of the school year. (Defs.' 56.1 Stmt. ¶¶ 135, 137; Pls.' 56.1 Resp. ¶¶ 135, 137.)

II.  Procedural Background

As discussed above, Plaintiffs commenced this action on January 9, 2015. The Complaint asserts the following claims: (1) negligent supervision and failure to supervise pursuant to 42 U.S.C. § 1983 ("Section 1983") (Compl. ¶¶ 130-51); (2) failure to protect pursuant to Section 1983 (Compl. ¶¶ 152-71); (3) failure to adhere to established policy pursuant to Section 1983 (Compl. ¶¶ 172-203; (4) negligence and gross negligence (Compl. ¶¶ 204-28); (5) assault and battery (Compl. ¶¶ 229-37)); (6) claims under 42 U.S.C. §§ 1981 and 1985 ("Sections 1981 and 1985") (Compl.

¶¶ 238-47); (7) intentional infliction of emotional distress (Compl. ¶¶ 248-58); and (8) municipal liability pursuant to Section 1983 (Compl. ¶¶ 259-72).[12] On March 24, 2015, the District Defendants filed their Answer and asserted a crossclaim against J.C., "John Doe" Cannon, and "Jane Doe" Cannon (together "the Cannons"). (Dist. Defs.' Answer, Docket Entry 21.) On July 16, 2015, the Cannons and J.C. answered the Complaint and asserted a crossclaim against the District Defendants. (Cannon Answer, Docket Entry 33.) On January 26, 2017, Plaintiffs voluntarily dismissed the claims against Kara Jacobson, Ellen Daniels, "John Doe" Drumm, and Nurse Jane Doe, and their Section 1981 and 1985 claims against all defendants. (See Stip.; Electronic Order, Jan. 30, 2017.)

On February 27, 2017, the District Defendants moved for summary judgment. On May 30, 2017, Plaintiffs filed their opposition, and the District Defendants filed their reply on June 12, 2017. (Pls.' Opp. Br., Docket Entry 71; Dist. Defs.' Reply Br., Docket Entry 73.)

---

[12] The Court will address each claim in more detail below, but at the outset, notes that most of the claims consist of identical allegations under different headings.

DISCUSSION

I.  Legal Standard

Summary judgment will be granted where the movant demonstrates that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A genuine factual issue exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed 2d 202 (1986).  In determining whether an award of summary judgment is appropriate, the Court considers the "pleadings, deposition testimony, answers to interrogatories and admissions on file, together with any other firsthand information including but not limited to affidavits." Nnebe v. Daus, 644 F.3d 147, 156 (2d Cir. 2011).

The movant bears the burden of establishing that there are no genuine issues of material fact.  Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1223 (2d Cir. 1994).  Once the movant makes such a showing, the non-movant must proffer specific facts demonstrating "a genuine issue for trial." Giglio v. Buonnadonna Shoprite LLC, No. 06-CV-5191, 2009 WL 3150431, at *4 (E.D.N.Y. Sept. 25, 2009) (internal quotation marks and citation omitted).  Conclusory allegations or denials will not defeat summary judgment.  Id.  However, in reviewing the summary judgment record, "'the court is required to resolve all ambiguities and

draw all permissible factual inferences in favor of the party against whom summary judgment is sought.'" Sheet Metal Workers' Nat'l Pension Fund v. Vadaris Tech. Inc., No. 13-CV-5286, 2015 WL 6449420, at *2 (E.D.N.Y. Oct. 23, 2015) (quoting McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997)).

II. The Federal Claims

With regard to the Section 1983 claims, Plaintiffs' Complaint is far from clear. The Complaint contains three counts under Section 1983: (1) negligent supervision and failure to supervise pursuant to Section 1983; (2) failure to protect pursuant to Section 1983; and (3) failure to adhere to established policy pursuant to Section 1983. (Compl. ¶¶ 130-203.) The failure to supervise and failure to protect claims are substantially similar; both claims allege that the District Defendants "maintained . . . a special relationship with [ ] Z.G.M," (Compl. ¶¶ 131, 153), were required pursuant to the Due Process Clause to protect Z.G.M.'s rights to "substantive due process, personal security, bodily integrity and the right to [be] protected," (Compl. ¶¶ 134, 156), and were "deliberate[ly] indifferent to the clearly established rights of [ ] Z.G.M," (Compl. ¶¶ 143, 164). Plaintiffs also allege that "Z.G.M. had a right to be free . . . from assault, battery, and harassment and had a constitutional right to bodily integrity," (Compl. ¶¶ 142, 163). Thus, the Court construes the failure to supervise and failure to protect claims as alleging that the

District Defendants violated Z.G.M.'s substantive due process rights.  The Court will address these claims first.

A.  <u>Substantive Due Process Claims</u>

The District Defendants argue that these claims must be dismissed because (1) negligent conduct cannot form the basis of a Section 1983 claim; (2) the District Defendants did not maintain a special relationship with Z.G.M.; and (3) the District Defendants did not create or increase the danger to Z.G.M.  (Dist. Defs.' Br., Docket Entry 68, at 4-8.)  In their opposition, Plaintiffs represent that "the facts of [the Section 1983] claim[s] present a case of first impression to this Court," but that these claims "may be considered analogous to claims by prison inmates and state institutionalized patients concerning deprivation of constitutional rights pursuant to § 1983."  (Pls.' Opp. Br. at 10.)  Plaintiffs maintain that because of compulsory attendance laws for public schools, the District Defendants owed a special duty to Z.G.M. (Pls.' Opp. Br. at 11.)  They also argue that that New York State's Dignity for All Students Act ("DASA") heightened that special duty, and as a result, "public schools [must] ensure a safe environment for all students, free from harassment." (Pls.' Opp. Br. at 11.)  Plaintiffs contend that because Z.G.M. was in "non-punitive state custody," he can maintain a substantive due process claim, and point to alleged deficiencies in the care provided by Nurse Bormann and Principal Henry's failure to call

the police as indicative of violations of due process. (Pls. Opp. Br. at 14-17.)

On reply, the District Defendants argue that Plaintiffs fail to address any of the authority cited in their moving brief. (Dist. Defs.' Reply Br. at 2-3.) Additionally, they point out that as a factual matter, Plaintiffs have not rebutted any of the evidence in the record that the District was not on notice of concerns about Z.G.M's safety or on notice of any tension between Z.G.M. and J.C. prior to the assault. (Dist. Defs.' Reply Br. at 3.) Finally, they contend that the alleged delay in calling an ambulance and failure to contact the police do not establish a substantive due process violation. (Dist. Defs.' Reply Br. at 6-7.)

To establish a claim under Section 1983, a plaintiff must show that the defendant violated a "right, privilege, or immunity secured by the Constitution or laws of the United States . . . by a person acting under color of state law." Ryan v. Cty. of Nassau, No. 12-CV-5343, 2018 WL 354684, at *2 (E.D.N.Y. Jan. 10, 2018) (internal quotation marks and citation omitted) (alteration in original). As discussed, Plaintiffs allege that the District Defendants violated Z.G.M.'s substantive due process rights. Pursuant to the Due Process Clause of the Fourteenth Amendment, "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." Drain v.

Freeport Union Free Sch. Dist., No. 14-CV-1959, 2015 WL 1014413, at *8 (E.D.N.Y. Jan. 14, 2015), R&R adopted in part, 2016 WL 1014451 (E.D.N.Y. Mar. 9, 2015) (internal quotation marks and citation omitted). Courts have interpreted the Due Process Clause as protecting "'an individual's right to bodily integrity free from unjustifiable government interference.'" P.W. v. Fairport Cent. Sch. Dist., 927 F. Supp. 2d 76, 81 (W.D.N.Y. 2013) (quoting Lombardi v. Whitman, 485 F.3d 73, 81 (2d Cir. 2007)). However, the Due Process Clause "does not require that the state 'protect life, liberty, and property of its citizens against invasion by private actors.'" Reid ex rel. Roz B. v. Freeport Pub. Sch. Dist., 89 F. Supp. 3d 450, 457 (E.D.N.Y. 2015) (quoting DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. 189, 195, 109 S. Ct. 998, 1003, 103 L. Ed. 2d 249 (1989)). As the Supreme Court explained in DeShaney, "[t]he [Due Process] Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." DeShaney, 489 U.S. at 195, 109 S. Ct. at 1003, 103 L. Ed. 2d 249.

The Second Circuit has recognized two exceptions to the general rule articulated in DeShaney. Matican v. City of N.Y., 524 F.3d 151, 155 (2d Cir. 2008). Specifically, a state "may owe a constitutional obligation to the victim of private violence" when (1) the state has created the danger or (2) when there is a special relationship between the state and the individual.

23

Matican, 524 F.3d at 155; see also Campbell v. Brentwood Union Free Sch. Dist., 904 F. Supp. 2d 275, 280 (E.D.N.Y. 2012). In addition to showing that one of these exceptions applies, the plaintiff must also show that the defendant's conduct was "'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" Matican, 524 F.3d at 155 (quoting Cty. of Sacramento v. Lewis, 523 U.S. 833, 847 n.8, 118 S. Ct. 1708, 1717, 140 L. Ed. 2d 1043 (1998)).

### 1. Special Relationship Exception

In DeShaney, the Supreme Court observed that "in certain limited circumstances, the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals," DeShaney, 489 U.S. at 198, 109 S. Ct. at 1004, 103 L. Ed. 2d 249, including "incarcerated prisoners and involuntarily committed mental patients," Matican 524 F.3d at 156. Since DeShaney, the Second Circuit has "focused on involuntary custody as the linchpin of any special relationship exception." Id. In other words, for this exception to apply, the state must have "somehow placed the victim within its custody." Campbell, 904 F. Supp. 2d at 280.

Plaintiffs argue that whether Z.G.M. maintains a special relationship with the District is an issue of first impression for this Court. (Pls.' Opp. Br. at 10.) While that may be true, of the many courts that have addressed this issue, the overwhelming

weight of authority is that the special relationship exception does not apply in the school setting. See Chambers v. N. Rockland Cent. Sch. Dist., 815 F. Supp. 2d 753, 763 n.10 (S.D.N.Y. 2011) ("The consensus among courts is that the 'special relationship' doctrine does not apply to the school setting.") (collecting cases); Drain, 2015 WL 1014413, at *9 ("A number of courts in the Second Circuit have consistently rejected attempts to impose special relationship status upon public school students.") (collecting cases). Plaintiffs argue that public school students are in the state's custody because the state requires that they attend school pursuant to compulsory attendance laws. (Pls.' Opp. Br. at 12.) However, this argument has been consistently rejected.[13]  See Nieves v. Bd. of Educ., No. 06-CV-0603, 2006 WL 2989004, at *3 (E.D.N.Y. Sept. 15, 2006) ("Compulsory attendance laws for public schools, however, do not create an affirmative constitutional duty to protect students from the private actions of third parties while they attend school.") (internal quotation

---

[13] Plaintiffs cite Tyrrell v. Seaford Union Free School District, No. 08-CV-4811, 2010 WL 1257793 (E.D.N.Y. Feb. 9, 2010), R&R adopted, 2010 WL 1198055 (E.D.N.Y. Mar. 25, 2010), as support for their arguments. (Pls.' Opp. Br. at 12.)  In Tyrrell, the plaintiff was claiming that she was denied equal access to a public education after she left school due to harassment by other students.  Tyrrell, 2010 WL 1257793, at *2-3, 6. Plaintiffs do not appear to claim that Z.G.M. was denied equal access to public education.  Additionally, while the claim in Tyrrell survived a motion to dismiss, it was ultimately dismissed on summary judgment.  Tyrrell v. Seaford Union Free Sch. Dist., 792 F. Supp. 601 (E.D.N.Y. 2011).

25

marks and citationomitted); HB v. Monroe Woodbury Cent. Sch. Dist.,
No. 11-CV-5881, 2012 WL 4477552, at *10 (S.D.N.Y. Sept. 27, 2012)
("'[E]ven in light of compulsory [education] attendance laws, no
special relationship is created between students and schools
districts . . . .'") (quoting Santucci v. Newark Valley Sch. Dist.,
No. 05-CV-971, 2005 WL 2739104, at *2 (N.D.N.Y. Oct. 24, 2005))
(second alteration in original).

     Z.G.M.'s relationship with the District does not
resemble the relationship between the state and prisoners or
between the state and individuals who are involuntarily committed,
both of which give rise to a heightened duty to protect individuals
from private harm.  Therefore, this Court joins the majority of
courts and holds that Z.G.M.'s status as a student does not impose
a constitutional obligation on the District to protect him from
private harm, and as a result, Plaintiffs cannot rely on the
special relationship exception as the basis for their substantive
due process claims.  See, e.g., Reid, 89 F. Supp. 3d at 458;
Campbell, 904 F. Supp. 2d at 281; Drain, 2015 WL 1014413, at *9;
HB, 2012 WL 4477552, at 10; P.W., 927 F. Supp. 2d at 82.

     2. State-Created Danger Exception

     Although Plaintiffs have not argued that the state-
created danger exception applies, the Court will briefly address
it.

     A state may violate a victim's due process rights "when

its officers assist in creating or increasing the danger that the victim faced at the hands of a third party." Matican, 524 F.3d at 157. However, the state must have "taken an active role in the deprivation of a right," and passive conduct is not sufficient. Reid, 89 F. Supp. 3d at 458. In some circumstances, "'affirmative conduct of a government official may give rise to an actionable due process violation if it communicates, explicitly or implicitly, official sanction of private violence.'" Id. at 459 (quoting Okin v. Vill. of Cornwall-On-Hudson Police Dep't, 577 F.3d 415, 429 (2d Cir. 2009)). Typically, in cases where the Second Circuit has applied this exception, "an agent of the state . . . was shown to have had a particular relationship with the perpetrator of the violence." Campbell, 89 F. Supp. 3d at 281. Further, "in the context of school bullying and harassment, courts have held that schools have no duty under the due process clause to protect students from assault by other students, even where the school knew or should have known of the danger presented." Scruggs v. Meriden Bd. of Educ., No. 03-CV-2224, 2007 WL 2318851, at *12 (D. Conn. Aug. 10, 2007) (collecting cases) (internal quotation marks omitted); see also Reid, 89 F. Supp. 3d at 459.

Based on the facts presented, the Court finds that the state-created danger exception does not apply. There is no evidence that the District or any of the individual defendants

engaged in any conduct that created or increased the risk of harm
to Z.G.M. at the hands of J.C.  It is undisputed that the District
was not on notice of any pre-existing tension between Z.G.M. and
J.C. and did not encourage or sanction the violence in any way.
See Campbell, 89 F. Supp. 3d at 281 (noting that the state-created
danger exception requires "a finding of affirmative conduct on the
part of the Defendant, usually acting in direct concert with the
perpetrator and witnessing the violence").  Therefore, the general
rule of DeShaney applies.  Plaintiffs' claim that the District
Defendants failed to adequately supervise its staff and failed to
protect Z.G.M. fails.  The District Defendants cannot be liable
for a due process violation based on the assault by J.C.  See
Campbell, 89 F. Supp. 3d at 281; Reid, 89 F. Supp. 3d at 460; HB,
2012 WL 4477552, at *10-11; Drain, 2015 WL 1014413, at *12.

      3. Shocking the Conscience

      Even if Plaintiffs could show that their claims fell
within the narrow exceptions to DeShaney, the District Defendants'
failure to prevent the assault and to protect Z.G.M. from
harassment does not rise to the level of "egregious" conduct "so
'brutal' and 'offensive to human dignity' as to shock the
conscience."  Smith v. Half Hollow Hills Cent. Sch. Dist., 298
F.3d 168, 173 (2d Cir. 2002) (quoting Johnson v. Glick, 481 F.2d
1028, 1033 & n.6 (2d Cir. 1973)).  The District's failure to
prevent an assault it had no reason to believe would occur surely

does not shock the conscience. As to the harassment, the record reflects that Z.G.M. was bullied on one occasion two days after his return to school. (Disciplinary Referral at 3.) However, it is undisputed that a teacher who overheard the incident reported it to Principal Henry, who suspended the students. (Defs.' 56.1 Stmt. ¶¶ 119, 140.) These actions seem appropriate and far from the "egregious" and "brutal" conduct required to sustain a substantive due process claim. Even if the School had done nothing in response to Z.G.M.'s complaint about the harassment, the claim would still fall short, as several courts in the Circuit have held that "a school's failure to remedy peer-to-peer bullying and harassment does not rise to the level of shock the conscience." Drain, 2015 WL 1014413, at *13 (internal quotation marks omitted).

To the extent Plaintiffs argue that events which occurred after the assault--Nurse Bormann's alleged failure to call an ambulance, Principal's Henry's failure to call the police, or Geramina's purported harassment of Z.G.M.--establish a substantive due process claim, those claims also fail. (Pls.' Opp. Br. at 13-15.) It is undisputed that an ambulance was called, and the police also responded to the School.[14] (Defs.' 56.1 Stmt.

---

[14] Plaintiffs argue that the Court should deny summary judgment on this claim in accordance with Ewing v. Roslyn High School, No. 05-CV-1276, Docket Entry 43, an unpublished decision by this Court. (Pls.' Opp. Br. at 16.) However, the Court finds that there are factual distinctions between this case and Ewing which undermine that argument. In Ewing, the plaintiff was assaulted

29

¶ 76; Pls.' 56.1 Counterstmt. ¶ 75.)  Construing the facts in Plaintiffs' favor, Nurse Bormann's failure to call an ambulance immediately and Principal Henry's failure to contact the police is not actionable conduct under the Due Process Clause.  See HB, 2012 WL 4477552, at *12 ("Making a bad decision or acting negligently is not the sort of conscience-shocking behavior that violates the Constitution.") (internal quotation marks omitted).  Moreover, any comments allegedly made by Geramina also cannot support a substantive due process claim.  Plaintiffs allege that Z.G.M. complained to Madigan and Principal Henry about Geramina questioning him about the pass in front of the class.[15]  (Guzman

---

by two students, and he requested that the assistant principal call an ambulance.  (Ewing, No. 05-CV-1276, Docket Entry 43, at 3.)  His father, upon hearing about the incident, also requested that the assistant principal call an ambulance, but the assistant principal said that it was not necessary.  (Ewing, No. 05-CV-1276, Docket Entry 43, at 3-4.)  It does not appear that an ambulance was ever called.  As a result, this Court allowed the plaintiff's substantive due process claim to proceed to trial due to issues of fact related to the assistant principal's intent when he denied the plaintiff access to emergency medical care.  (Ewing, No. 05-CV-1276, Docket Entry 43, at 9.)  Here, Nurse Bormann called an ambulance after Guzman requested one and after Z.G.M. told her he was "seeing waves," and he received the necessary medical care.  (Defs.' 56.1 Stmt. ¶¶ 74, 76.)

[15] Plaintiffs allege in their Complaint that on one occasion, Geramina asked Z.G.M. "when is this shit going to stop?" (Compl. ¶ 126.)  However, they failed to proffer any admissible evidence of this comment in their 56.1 Response or 56.1 Counterstatement of Facts.  As a result, the Court has not considered it.  Even if Plaintiffs had proffered evidence of such a statement by Geramina, it would not change the result, because one comment is not sufficient to establish a substantive due process claim.

50-H Exam. 48:8-15; Pls.' 56.1 Counterstmt. ¶ 155.)  However, the Court finds that the harassment by Geramina, assuming it occurred, is not sufficiently brutal or offensive to constitute a violation of Z.G.M.'s due process rights.  See Smith, 298 F.3d at 173 (holding that a single slap by a teacher did not shock the conscience and affirming dismissal of substantive due process claim); Yap v. Oceanside Union Free Sch. Dist., 303 F. Supp. 2d 284, 297 (E.D.N.Y. 2004) (dismissing substantive due process claim based on racially motivated comments by lunchroom monitor).

Therefore, for the reasons stated above, Plaintiffs' failure to supervise and failure to protect claims under Section 1983 are DISMISSED.

B. Failure to Follow Established Policy

The District Defendants contend that this claim must be dismissed because violations of policy or state law are not cognizable claims under Section 1983.  (Dist. Defs.' Br. at 9.) Plaintiffs emphasize that the District Defendants did not follow the School's policies and "failed to conduct a proper investigation pursuant to DASA."  (Pls.' Opp. Br. at 12-13.)  This failure, according to Plaintiffs, constituted "deliberate indifference in the enforcement of their policies and practices."  (Pls.' Opp. Br. at 14.)

The Court agrees with the District Defendants. Violations of institutional policy or state law are not a basis

for a Section 1983 claim.  See Holland v. City of N.Y., 197 F.
Supp. 3d 529, 548-49 (S.D.N.Y. 2016) ("'[A] § 1983 claim brought
in federal court is not the appropriate forum to urge violations
of prison regulations or state law.'") (quoting Rivera v. Wohlrab,
232 F. Supp. 2d 117, 123 (S.D.N.Y. 2002)).  The District's alleged
violations of its own policies or DASA cannot establish a
constitutional violation.   Thus, the failure to adhere to
established policy claim under Section 1983 is DISMISSED.  See id.
(dismissing due process claim based on violation of prison
policies).

   C. Guzman and Milton's Section 1983 Claims

      The parents' claims for psychological injuries and
emotional distress under Section 1983 must also be dismissed.
(Compl. ¶¶ 149-150, 169-170, 201-202.)  See Drain, 2015 WL 1014413,
at *15 (dismissing parents' claims under Section 1983).  Guzman
and Milton's claim that they were injured as a result of the
District Defendants' violations of Z.G.M.'s rights (Pls.' Opp. Br.
at 17) is entirely without merit.  As parents, they do not have
standing to bring individual claims based on the violation of their
child's rights.  See id. (collecting cases); HB, 2012 WL 4477552,
at *19.  Further, there is no evidence of a loss of custody that
could support a violation of the right to family integrity.  Drain,
2015 WL 1014413, at *16 ("'[W]here there is no actual loss of
custody, no substantive due process claim can lie.'") (quoting

32

K.D. v. White Plains Sch. Dist., 921 F. Supp. 2d 197, 217 (S.D.N.Y. 2013)). Therefore, Guzman and Milton's Section 1983 claims are DISMISSED.[16]

### D. Municipal Liability

Because Plaintiffs have not established a constitutional violation, their claim for municipal liability under Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 98 S Ct. 2018, 56 L. Ed. 2d 611 (1978), is DISMISSED. See Holland, 197 F. Supp. 3d at 552; Reid, 89 F. Supp. 3d at 460.

## III. The State Law Claims

In light of the dismissal of the federal claims, only Plaintiffs' negligence, gross negligence, and intentional infliction of emotional distress claims against the District Defendants and the assault and battery claim against J.C. and the Cannons remain. "[A]bsent exceptional circumstances, where federal claims can be disposed of pursuant to Rule 12(b)(6) or [on] summary judgment grounds, courts should abstain from exercising pendant jurisdiction." Dole v. Huntington Union Free Sch. Dist., 2016 WL 4703658, at *7 (E.D.N.Y. Sept. 8, 2016), aff'd, 699 F. App'x 85 (2d Cir. 2017) (internal quotation marks and citation omitted); Krumholz v. Vill. of Northport, 873 F. Supp. 2d

---

[16] Because Plaintiff's underlying claims are without merit, it is unnecessary for the Court to determine whether the District Defendants are entitled to qualified immunity.

481, 492 (E.D.N.Y. 2012). The Court determines that retaining jurisdiction over the remaining state law claims is unwarranted. Thus, the Court declines to exercise supplemental jurisdiction over those claims pursuant to 28 U.S.C. § 1367(c)(3), and the state law claims are DISMISSED WITHOUT PREJUDICE.

## CONCLUSION

For the foregoing reasons, the District Defendants' motion for summary judgment (Docket Entry 66) is GRANTED IN PART and DENIED IN PART. Plaintiffs' federal claims under Section 1983 are DISMISSED WITH PREJUDICE. The Court declines to exercise supplemental jurisdiction over the remaining state law claims, and DISMISSES those claims WITHOUT PREJUDICE. The crossclaims are similarly DISMISSED WITHOUT PREJUDICE. If Plaintiffs choose to pursue their state law claims, Defendants may assert crossclaims in that forum. The Clerk of the Court is directed to enter judgment accordingly and mark the case CLOSED.


SO ORDERED.


/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.


Dated:     March __1__, 2018
           Central Islip, New York